**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN SMENTEK, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 09 C 529 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| SHERIFF OF COOK COUNTY and | ) | |
| COOK COUNTY, ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Plaintiffs brought suit under 42 U.S.C. § 1983 against Cook County and its sheriff charging that inadequate dental care at Cook County Jail ("CCJ") constitutes cruel and usual punishment in violation of the Eighth and Fourteenth Amendments. The court certified two classes under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3). (*See* dkts. 68, 93.) Plaintiffs moved for a preliminary and permanent injunction on January 6, 2014. (Dkt. 236.) In April 2014, defendants moved to decertify the classes. (Dkt. 306.) The court stayed briefing on the motion to decertify and conducted a bench trial on injunctive relief in June 2014. On August 21, 2014, the court denied plaintiffs' request for a preliminary injunction and ordered briefing on defendants' motion to decertify. (Dkt. 372.) For the reasons stated below, the court decertifies the (b)(2) class, making the motion for a permanent injunction moot, and orders modification of the (b)(3) class definition.

**BACKGROUND FACTS**

**I.      Class Definitions**

The court certified a (b)(2) class consisting of "[a]ll persons presently confined at the

Cook County Jail who are experiencing dental pain and who have waited more than seven days

after making a written request for treatment of that pain without having been examined by a

dentist." (Dkt. 68 at 15.)  The court also certified a (b)(3) class consisting of "[a]ll inmates

housed at Cook County Department of Corrections on or after January 1, 2007, who have made a

written request for dental care because of acute pain and who suffered prolonged and

unnecessary pain because of lack of treatment." (Dkt. 93 at 11.)

**II.      CCJ Population and Health Care**

CCJ has a population of approximately 9,500 detainees. (Tr.[1] 1193.)  The average length

of stay at CCJ is fifty-seven days and the median length of stay is twelve days. (Tr. 1195–96.)

Cermak Health Services ("Cermak"), a division of Cook County Bureau of Health

Services, provides medical and dental care to detainees at CCJ.  Each of the approximately ten

divisions at the jail has a medical dispensary that is open on weekday afternoons, and there is a

sick call staffed by a registered nurse twice a day. (Tr. 1233–34.)  Cermak also operates an on-

site emergency room that is open twenty-four hours a day. (Tr. 1234.)

**III.      CCJ Dental Care**

Dental care at CCJ has changed significantly in the past seven years.  In 2007, Cermak

employed one dentist and care was limited to extractions. (*See* dkt. 68 at 1.)  Today, there are six

dental clinics at the jail, each located in a different division.[2] (Tr. 864, 959, 1117.)  The clinics

---

[1] "Tr." citations refer to the transcript of the bench trial on injunctive relief held in early June 2014.

[2] The Sheriff moves detainees without a clinic in their division to a designated clinic. (Tr. 960–61, 1197, 1235.)

2

are staffed by seven dentists,[3] two dental hygienists, and seven dental assistants.[4]  (Tr. 864–65.)
The staffing ratio is approximately one dental provider for every 1000 detainees, which is within
optimal range for dental care in a correctional setting.  (Tr. 145–46, 589.)  The dental clinics are
open five days a week and each conducts a morning and afternoon session, seeing approximately
fifteen patients per day.[5]  (Tr. 498, 608–09.)

There are several avenues through which a detainee may seek care at a dental clinic.  If a
detainee complains of dental pain to a nurse or officer, the nurse or officer may call the clinic
and ask whether the detainee can be seen immediately.  (Tr. 894, 1135, 1235.)  A detainee may
also submit a Health Service Request form ("HSR") to a designated spot in his housing unit.  (Tr.
1236.)  The HSRs are supposed to be retrieved daily and reviewed by a nurse.[6]  (Tr. 615, 992.)
If the HSR includes a symptomatic complaint, such as pain, policy dictates that a nurse should
examine the detainee within twenty-four hours.  (Tr. 1238, 1271.)

After a nurse reviews the HSRs, the dental assistants retrieve those that contain dental
complaints.[7]  (Tr. 453.)  The dental assistants (and sometimes the dentists) review the HSRs and
the dental assistants enter them into the electronic records system and categorize the request as
urgent, priority, or routine.  (Tr. 452–53, 455–56, 652, 895, 993.)  If a detainee complains of

---

[3] In their motion for an injunction filed in January 2014, plaintiffs stated that only five dentists
worked at CCJ and included a request that defendants hire more dentists.  (Dkt. 236 at 5 & n.5.)  Plaintiffs
did not repeat their request for additional staffing at trial or in their post-trial briefs.

[4] The dental assistants perform administrative work in the clinics and take patient histories.  (Tr.
491.)  They do not provide patient care.  (Tr. 449.)

[5] When the clinics are not open, detainees with urgent dental complaints may be sent to the
emergency room at Cermak.  (Tr. 894.)

[6] Neither plaintiffs nor defendants called a nurse who performs the initial review of the HSRs to
explain the practices and procedures for the review.

[7] The dental assistant for Division 6 testified that she picks up between five and ten HSRs a day.
(Tr. 461.)

pain, the request is marked urgent.  (Tr. 452–53.)  If a request is marked urgent, the detainee is scheduled to visit the dental clinic within a week.  (Tr. 474.)  The dental assistant may request a specific appointment date after taking into account dates that the detainee is not available.  (Tr. 466.)  After receiving an urgent HSR, a dental assistant also may ask officers to bring the detainee to the clinic immediately for an evaluation by the dentist.  (Tr. 458, 468–470.)

Before 2013, the dental clinics had no control over patient scheduling and relied on a separate patient scheduling department.  (Tr. 467.)  The dental staff complained about their inability to control scheduling in the summer of 2013 and, in late 2013, the policy was changed to allow the dental clinics to schedule five emergency patients each afternoon.  (Tr. 476–77, 483–84, 863–64.)  The five emergency slots typically are filled by detainees who have filed grievances and detainees who have submitted HSRs indicating emergencies or urgent issues.  (Tr. 485, 1006–07.)  The chief operating officer of Cermak testified that he has noticed a decrease in grievances since the new emergency slots were instituted, and the director of oral health testified that the number of grievances has been reduced by almost 58% as a result of the schedule change.  (Tr. 1284; *see also* Tr. 500.)

The dental clinics are not equipped to handle every case.  Oral surgeons at Stroger Hospital ("Stroger") perform more complex oral surgeries and diagnose difficult cases.[8]  (Tr. 834.)  An electronic referral system is used to schedule surgeries at Stroger.  (Tr. 1241, 1295.)  The dentist enters a request for a patient service into the system, and then Stroger schedules the appointment.  (Tr. 666, 1241.)  Each weekday Stroger allocates two or three oral surgery slots to

---

[8] Since 2012, the Cermak budget has included funding for a part-time oral surgeon at CCJ, but one dentist testified that the proposed salary is inadequate to attract a candidate.  (Tr. 1012–14, 1256.)

CCJ detainees.[9]  (Tr. 1017, 1296.)  Historically detainees have had to wait months (and even years) for oral surgery at Stroger[10] (Tr. 836, 845), but Dr. Townsend, one of the dentists at CCJ, testified that the wait was approximately two weeks at the time of the hearing.  (Tr. 1022.)

If a detainee believes his care is inadequate he may file a grievance.  (Tr. 653–54, 1202–03.)  Grievances are picked up by a counselor, sorted, and distributed to the appropriate area.  (Tr. 660–61.)  If the grievance touches on a medical issue, the Sheriff forwards it to Cermak.  (Tr. 1203.)  Linda Murakami, Cermak's former director of quality improvement, oversaw the grievance process for medical issues before she left the position in March 2014.  (Tr. 653.)  Murakami testified that in early 2013 she could request an appointment for detainees who complained that they had not received adequate dental care but could not actually schedule the appointment.  (Tr. 654.)  At the end of 2013, the procedures for addressing dental grievances were modified and the grievances are now faxed directly to a member of the dental staff for scheduling.  (Tr. 659, 689.)

## IV.      Dental Care Policies

Cermak has two official policies that govern treatment of dental pain.[11]  The first policy covers general non-emergency health care requests and services.  (P. Ex. 110.)  The policy provides that Cermak will collect HSRs on a daily basis and review them within twenty-four hours.  (*Id.* at 1.)  For requests that describe a clinical symptom, such as pain, "Cermak will

---

[9] The assistant director of oral health testified that as of July 1, 2014 there would be four oral surgery slots for detainees each weekday.  (Tr. 1296.)  The number of detainees that are treated at Stroger each day is limited to the number of seats on the bus that goes to Stroger.  (Tr. 1307.)  Sometimes patients with non-dental ailments will take precedence over dental patients on the bus.  (Tr. 1082–83.)  One dentist testified that he refers approximately ten detainees for oral surgery each month.  (Tr. 836.)

[10] Dr. Rabin, one of the CCJ dentists, testified that he advises detainees scheduled for oral surgery at Stroger to submit an HSR if they have pain while waiting for their appointment so that he can prescribe additional medication to reduce pain during the wait.  (Tr. 892.)

[11] The parties focused on the two policies described here, but there may be additional policies touching on dental care at CCJ.  (Tr. 993.)

provide a face-to-face evaluation by a qualified health professional on the next business day in the health service dispensary or other clinical setting." (*Id.*) The policy also provides, "dental symptoms with pain are to be brought to [Health Service Dispensary] clinic for immediate evaluation & treatment; if treated at clinic, must be entered into [electronic record]." (P. Ex. 110 at 3.) Dental issues with no "nursing follow-up" are to be forwarded to the dental department, where the dental assistants will enter the HSR into the electronic records system. (*Id.*)

The second policy specifically covers oral care. (P. Ex. 105.) The policy lists five acuity levels and timeframes for care:

| Acuity Level | Timeframe | Description | Examples |
|---|---|---|---|
| Emergency | Immediately | Patient may suffer irreparable harm if not treated within hours | • Acute fracture<br>• Acute, severe oral infections |
| Urgent | Within 1 week and, whenever possible, within 3 business days | Serious conditions not considered oral emergencies | • Broken teeth with exposed nerve<br>• Oral infections<br>• Dental caries with pain that cannot be controlled by analgesics |
| Priority | Within 2 weeks | Require treatment but not urgently | • Acutely chipped teeth without exposed nerve<br>• Dental caries without swelling or uncontrollable pain |
| Routine | Next available routine appointment | Routine care | • Gingivitis<br>• Preventive care |

(*See id.* at 3.) Although the court heard testimony about the policies, plaintiffs do not appear to argue that they fall below the standard of care. Plaintiffs' argument focuses on whether the policies are implemented consistently. (*See* Tr. 593.)

## V. Detainee Testimony and Records

Eight current and former detainees at CCJ testified at trial. The detainees' testimony and medical records demonstrate that the current treatment of dental issues and dental pain at CCJ

does not always adhere to the policies and practices detailed above, and detainees may face obstacles to care at several stages of the treatment process.

For example, Jonathan Williams testified that he waited years to be sent to Stroger for removal of a tooth that was causing him pain. (*See generally* Tr. 194–236; P. Exhs. 98–99.) During the time he waited for surgery he filed numerous HSRs requesting pain medication and antibiotics to treat the tooth, but there were consistent delays in treatment. (*Id.*)

Quentin Scott saw a physician's assistant on the same day he submitted an HSR complaining of tooth pain, and he was given aspirin and ibuprofen. (P. Exh. 81 at 127.) Two days later he visited the dental clinic and the dentist referred him to Stroger for surgery and prescribed antibiotics and pain medication. (Tr. 310–11.) He did not receive the medication in a timely manner. (P. Exh. 82 at 13.) More than six months later the teeth causing him pain were pulled at Stroger. (Tr. 322.)

John Saiger[12] broke his wisdom tooth in April 2013 while he was at CCJ. Saiger notified an officer that he was in intense pain; the officer responded that he should fill out an HSR. (Tr. 386.) Saiger submitted two HSRs but did not see a medical provider. (Tr. 387.) Saiger filed a grievance two months later in June 2013, complaining about the lack of treatment. (Tr. 388–89; P. Exh. 79 at 6.) He subsequently moved divisions and a scheduled dental appointment had to be rescheduled. (*Id.* at 8.) He saw the dentist in September 2013, five months after he broke his wisdom tooth. (Tr. 390–91.) The dentist examined his teeth, took an x-ray, stated that an extraction was necessary, prescribed one week of antibiotics and ibuprofen to prepare the tooth for extraction, and scheduled Saiger for a return visit in a week. (Tr. at 391.) Saiger was not

---

[12] Saiger has opted out of the class and has an individual lawsuit pending. *See Saiger* v. *Dart*, No. 13 C 5495 (N.D. Ill. filed Aug. 1, 2013).

returned to the dentist in a timely manner and, after another grievance and appeal, he saw a dentist at CCJ on January 19, 2014 and his dental issues were resolved.  (Tr. 396.)

Stanford Thompson[13] chipped his tooth at CCJ and asked an officer to send him to the medical unit for care.  The officer refused.  (Tr. 764.)  The next morning Thompson submitted an HSR complaining about tooth pain, but he did not see a medical provider.  (P. Ex. 86 at 1.)  A couple of weeks later, Thompson visited the dispensary for an unrelated issue and informed the doctor about his tooth pain.  (Tr. 767–68.)  The doctor prescribed ibuprofen.  (*Id.*)  Thompson filed a grievance requesting to see a dentist.  (P. Ex. 87 at 1.)  A week later, a dentist saw him and prescribed ibuprofen and antibiotics.  (Tr. 770.)  Thompson returned to the dentist after a week and the tooth was extracted.  (*Id.*)

Jason Knickrehm submitted an HSR on October 8, 2013, complaining of a toothache and a hole in his tooth.  (P. Ex. 66 at 3.)  He was not brought to see a medical provider.  (Tr. 415; P. Ex. 66 at 1–2.)  After he submitted another HSR and a grievance, Knickrehm was seen in urgent care and prescribed medication, which he did not receive.  (Tr. 419–20.)  Knickrehm visited the dental clinic about six weeks after his initial complaint and was given antibiotics and ibuprofen.  (Tr. 420.)  The dentist requested a follow-up appointment for the next week to pull the teeth after the infection subsided, but Knickrehm did not return.  (Tr. 421–22.)  Knickrehm filed another grievance and he was brought to the dental clinic three days later.  The dentist pulled one tooth and prescribed additional antibiotics and ibuprofen.  (Tr. 423–24, 815–17; P. Ex. 67 at 6–7.)  He did not receive the medication and the remaining teeth were not removed for over a month.  (Tr. 425.)

---

[13] Thompson has opted out of the class and has an individual lawsuit pending.  *See Thompson* v. *Dart*, No. 13 C 6946 (N.D. Ill. filed Sept. 26, 2013).

Orlando Allen submitted two or three HSRs and a grievance complaining of dental pain before he was seen. (Tr. 694–96l; P. Ex. 13 at 1, 2, 5; P. Ex. 14 at 1.) Allen visited the dental clinic about two months after his original request. (Tr. 700.) The dentist prescribed antibiotics and pain medication, but Allen's tooth was too swollen to be removed. (*Id.*) Allen returned to the clinic a few days later and the dentist operated on the tooth and relieved the pain.[14] (Tr. 701.)

## VI. Expert Testimony

### A. Plaintiffs' Expert Dr. Jay Shulman

At the bench trial, the plaintiffs' expert, Dr. Jay Shulman, did not offer any opinion about the adequacy of the dental care policies at CCJ, the staffing levels, or the quality of care. (Tr. 40.) He did not visit CCJ. (Tr. 589.) Based on his review of medical files,[15] Dr. Shulman concluded that "face-to-face examinations by nursing staff are not consistent" and "pain relief is not a systematic part of the treatment system." (Tr. 86.) On cross-examination, Dr. Shulman conceded that that dental care staffing at CCJ was within optimal range and that there is an allowable error rate (10–25% depending on the care being measured) for dental treatment in a correctional setting. (*See* Tr. at 133–38, 146.)

---

[14] Allen also had a dental issue in October 2013 for which the care was significantly better. He submitted an HSR on October 28 complaining about pain on the right side of his face. (Tr. 712; P. Ex. 12 at 20.) The next day he saw a registered nurse who gave him Tylenol and he visited the dental clinic on October 31. (Tr. 712–13.)

[15] These fourteen files were not culled randomly. Their genesis is as follows: Plaintiffs attached fifty-three inmate affidavits to their motion for preliminary injunction filed in January 2013, after the close of discovery. (*See* dkt. 236, ex. 11.) Defendants moved to strike the affidavits but also produced medical records for the first fourteen of the fifty-three affiants and used information in those records to rebut the substance of plaintiffs' motion. (*See* dkt. 251 at 9 & n.4.) Dr. Shulman reviewed these medical records and found that pain relief was substandard for the majority of the fourteen inmates. (Tr. 170–71, 284.) Plaintiffs argue that the court unfairly restricted the discovery to preclude them from obtaining adequate records to support their case, and thus the lack of randomness of the sample must not be held against them. The court must note that there was, in fact, a somewhat random sampling done in this case in spring of 2011 when the court ordered defendants to provide the names and medical records of all detainees treated in Division 11 dental clinic on February 9, 2011. The plaintiffs subsequently withdrew the motion for a preliminary injunction pending at the time of the sampling. (*See* dkt. 81.)

Plaintiffs attached a supplemental report from Dr. Shulman to their response to the decertification motion. (*See* dkt. 373, ex. 1.) Defendants have moved to strike the supplemental report as untimely. (Dkt. 381.) In the report, Dr. Shulman asserts the following opinions that relate to certification issues:

> 1. A reliable determination of whether a detainee experienced dental pain can be made from the following:
>
>> A. Whether the detainee submitted a health service request form or a grievance complaining of a toothache or dental pain,
>>
>> B. Whether a health services provider, such as a registered nurse, a physician's assistant, a physician, or a dentist, recorded pain in a clinical note, or prescribed an analgesic in response to the health service request form complaining of a toothache, and
>>
>> C. Whether the detainee, if seen by a dentist, was prescribed an analgesic or underwent a dental procedure that would have alleviated pain.
>
> 2. Any failure to provide return dental appointments within ten days after a detainee has been furnished an antibiotic for a dental infection is likely, with a reasonable degree of dental certainty, to result in a recurrence of preventable and gratuitous pain because of a recurrence of infection that will not be eliminated until the tooth (that is the underlying source of the infection) is treated.

(Dkt. 373, ex. 1 at 1.) Although defendants argue that this report is untimely, it is submitted in response to defendants' motion for decertification rather than in support of the requested injunctive relief. Thus the court will not strike the report and will include it in the materials considered with respect to its decertification decision.

## B. Defendants' Expert Dr. Karl Meyer

Defendants' expert, Dr. Karl Meyer, visited CCJ in January 2014 and toured the dental clinics. (Tr. 1111–12.) He observed the flow of patients and reviewed the daily appointment logs and HSR forms on the desk. (Tr. 1117.) He also reviewed Cermak's policies on oral and non-emergency care. (Tr. 1115–16.)

Dr. Meyer opined that the facilities, staffing levels, and equipment he observed are sufficient to meet the dental health needs of the detainee population.[16] (Tr. 1117, 1120.) He testified that the HSRs he found on the desks in the dental clinic were timely addressed. (Tr. 1118–19, 1126.) He further testified that there was "quite a bit" of routine dental care provided at CCJ, which was uncommon for jail facilities with a high turnover rate. (Tr. 1136–37.)

Dr. Meyer also testified that the policies governing dental care at CCJ are consistent with guidelines promulgated by the National Commission on Correctional Health Care. (Tr. 1130–32.) He noted that outside correctional facilities, when there are limited oral surgery resources, patients may be required to wait extended time periods (up to nine months) for oral surgery. (Tr. 1141–42.) In the interim, the patient is seen episodically to control pain or infection. (Tr. 1142.)

Finally, Dr. Meyer testified that CCJ is addressing the issues raised in Dr. Shulman's report and testimony. Dr. Meyer also noted that the fourteen records reviewed by Dr. Shulman were not randomly selected but were pulled from detainees who had filed grievances about their dental care. (Tr. 1147–49.)

## VII.    Monitor's Report

The federal government currently monitors medical care (including dental care) at CCJ pursuant to a 2010 consent order entered in *United States* v. *Cook County, Ill.*, No. 10 C 2946 (N.D. Ill. filed May 13, 2010). The court granted plaintiffs' motion to take judicial notice of the monitor's most recent report, filed in May 2014. (*See* dkt. 384, ex. 1 ("Monitor's Rpt."); dkt. 389.) The executive summary of the report notes, "Inmates currently do not have timely access to care which increases their risk of harm. On any given day, staff vacancies result in redeployment of nurses to medication administration and inmate health requests are not

---

[16] Dr. Meyer testified that acceptable staffing ratios were in the range of one dentist for every 1000 to 1500 detainees. (Tr. 1121.)

processed." (Monitor's Rpt. at 2.) In addition, the monitor found that when nurses do see detainees with urgent dental problems as a result of an HSR, the care may be insufficient: "[F]or patients with dental pain the nurse may only give ibuprofen 200 mg three times daily for two days which for many patients is insufficient dosing and not long enough to last until the dentist can see the patient." (*Id.* at 45.)

The monitor reported that dental care was in "partial compliance" with the consent order because of the "difficulty with accurate measuring and reporting of dental wait times." (*Id.* at 2.) Specifically, the monitor observed,

> The current dental wait time for immediate and urgent HSRs is one to three days. Routine dental HSR wait time is reported to be about 30 days. It unfortunately remains true, however, that it is extremely difficult if not impossible to verify the dental wait time due to inherent [electronic record] rigidity with regard to the ability to locate the HSR form that resulted in the dental clinic visit.

(*Id.* at 67.)

## LEGAL STANDARD

Rule 23(c)(1) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1). Thus, until the court enters final judgment, a certification order is "inherently tentative." *Coopers & Lybrand* v. *Livesay*, 437 U.S. 463, 469 n.11, 98 S. Ct. 2454, 57 L. Ed. 2d 351 (1978). The standard for decertification is identical to the standard for certifying the class in the first instance, but the court may consider new evidence. As the Fifth Circuit observed, "Under Rule 23, the district court is charged with the duty of monitoring its class decisions in light of the evidentiary development of the case. The district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts." *Richardson* v. *Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983); *see also Lightfoot* v. *Dist. of Columbia*, 246 F.R.D.

326, 334 & n.6 (D.D.C. 2007); *cf. Culver* v. *City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) (affirming decertification of class).

## ANALYSIS

A party seeking to certify a class action must demonstrate that the class is "ascertainable," satisfies the prerequisites of Rule 23(a), and qualifies under at least one of the three subsections of Rule 23(b).[17] *See Jamie S.* v. *Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012). Rule 23(a) requires (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a). The court certified two classes in this case. First, the court certified a class under Rule 23(b)(2), which requires a finding that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Second, the court certified a class under Rule 23(b)(3), which requires a finding that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"Class certification is appropriate only if, 'after a rigorous analysis,' the trial court is satisfied that the requirements of Rule 23 have been met." *Jamie S.*, 668 F.3d at 493 (quoting *Wal-Mart Stores, Inc.* v. *Dukes*, --- U.S. ---, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011)). This may require inquiry into the merits of the plaintiff's underlying claim. *Id.* Courts have

---

[17] It is not settled whether plaintiffs or defendants bear the burden of proof on motions for decertification. *Compare Harper* v. *Yale Int'l Ins. Agency, Inc.*, No. 03 C 3789, 2004 WL 1080193, at *2 (N.D. Ill. May 12, 2004) (plaintiffs' burden); *Ellis* v. *Elgin Riverboat Resort*, 217 F.R.D. 415, 419 (N.D. Ill. 2003) (same), *and Clarke ex rel. Pickard* v. *Ford Motor Co.*, 228 F.R.D. 631, 633 (E.D. Wisc. 2005) (defendants' burden). The court will not resolve this issue here because, even if it is defendants' burden, they have adequately shown that subsequent developments warrant decertification of the (b)(2) class and modification of the (b)(3) class.

broad discretion in their decision whether to certify a class. *Keele* v. *Wexler*, 149 F.3d 589, 592 (7th Cir. 1998).

The evidence at the trial demonstrates that some of the facts on which the court based its initial certification are no longer true. After reviewing the Rule 23 requirements for each class in light of the situation today, the court finds it necessary to revisit its certification decision with respect to commonality as well as the specific requirements of (b)(2) and (b)(3).[18]

## I.    Rule 23(a)(2)—Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In *Wal-Mart*, the Supreme Court rejected superficial common questions, such as whether each class member "suffered a violation of the same provision of law." *Wal-Mart*, 131 S. Ct. at 2551. The Court held that the common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Applying this standard, the Court reversed the district court's certification of a class of female Wal-Mart employees because the alleged discriminatory employment decisions were not made pursuant to uniform policy or practice. *Id.* at 2556–57. The fact that Wal-Mart's local managers used their discretion to make employment decisions vitiated the common question of whether the decisions were discriminatory. *Id.* at 2554–55.

In its opinions following *Wal-Mart*, the Seventh Circuit has looked at whether class members' claims "share some question of law or fact that can be answered *all at once* and that the *single answer* to that question will resolve a central issue in all class members' claims."

---

[18] Defendants also argue that the (b)(2) and (b)(3) classes are not ascertainable, do not satisfy typicality, are not adequately represented, and improperly prevent defendants from asserting affirmative defenses. (*See generally* dkt. 309.) Many of the points made by defendants in support of these arguments overlap with arguments addressed in this opinion or were rejected in the court's original certification opinions and the court will not revisit them here.

*Jamie S.*, 668 F.3d at 497; *see also Suchanek* v. *Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir.

2014) ("What matters to class certification is the capacity of a classwide proceeding to generate

common answers apt to drive the resolution of the litigation.") (quoting *Wal-Mart*, 131 S. Ct. at

2551) (internal quotation marks omitted); *Butler* v. *Sears, Roebuck & Co.*, 727 F.3d 796, 801

(7th Cir. 2013), *cert. denied*, 134 S. Ct. 1277, 188 L. Ed. 2d 298 (2014) (class treatment may be

justified if there is one issue central to the validity of each of the claims in a class action that can

be decided in one proceeding).

   In order to assess whether there is a common question of law or fact, a court must look to

the law governing the plaintiffs' claims. Deliberate indifference claims generally require an

individualized inquiry into whether a plaintiff demonstrates "(1) an objectively serious medical

condition; and (2) an official's deliberate indifference to that condition."[19] *Arnett* v. *Webster*,

658 F.3d 742, 750 (7th Cir. 2011) (citations omitted). A claim also may succeed if a plaintiff

shows "there are such systemic and gross deficiencies in staffing, facilities, equipment, or

procedures that the inmate population is effectively denied access to adequate medical care."

*Wellman* v. *Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (quoting *Ramos* v. *Lamm*, 639 F.2d 559,

575 (10th Cir. 1980)) (internal quotation marks omitted).

   In its opinion certifying the (b)(2) class, the court found that the question common to all

plaintiffs was whether the alleged inadequacy of dental staff deprived class members of timely

relief from dental pain:

> [Plaintiffs] claim that inmates with dental pain are suffering
> unnecessary and prolonged pain due to defendants' decision to
> reduce dental services at the jail, particularly in reducing the
> number of dentists there to one. Whether this decision has

---

[19] Deliberate indifference is more than mere negligence, it requires that a defendant "acted with a sufficiently culpable state of mind" akin to "criminal recklessness." *Holloway* v. *Del. Cnty. Sheriff*, 700 F.3d 1063, 1072–73 (7th Cir. 2012).

> caused unnecessary pain and delay is a question common to
> the class and based on the same conduct of defendants.

(Dkt 68 at 13.) The court reiterated the common question in its opinion certifying the (b)(3)

class: "Plaintiffs here are attacking a policy of deliberate indifference by reducing staff to a level

making it a virtual certainty that adequate care will not be provided, as opposed to a situation

where an adequately staffed facility fails to treat some individuals as promptly as it should."

(Dkt. 93 at 6.)

After the trial on injunctive relief, it is evident that this common question of causation no

longer exists. Defendants have significantly increased dental staffing at the jail to within optimal

range. (Tr. 145–46, 589.) Defendants' policies generally fall within the nationally recognized

standard of care and are similar to policies used in other correctional settings. (Tr. 40, 557,

1130–32.) Thus the question that was common to all plaintiffs—whether the alleged inadequacy

of dental staff deprived class members of timely relief of dental pain—is no longer present.

Although plaintiffs presented evidence that class members suffer unnecessary pain,

witness testimony demonstrated that treatment of dental pain may fall below the deliberate

indifference threshold for many reasons and at many stages in the treatment process. There is no

longer one cause common to all plaintiffs. In some instances, officers did not call medical staff

to provide immediate pain relief to a detainee. In other instances, detainees remained in

unnecessary pain because nurses did not timely review their HSRs and did not call them down

for a face-to-face examination or prescribe painkillers within the appropriate time period. When

medication was prescribed, some detainees did not receive it. Sometimes detainees waited too

long for an initial appointment with a dentist, at other times, detainees did not receive follow-up

appointments when necessary. Some detainees experienced significant delays before seeing an

oral surgeon who could ultimately resolve the cause of the pain. Failure to remediate dental pain

at any of these points may constitute deliberate indifference depending on the facts of the individual case but, unlike the circumstances present at the time the classes were certified, there is no longer a single question the answer to which would resolve a significant issue in the case.

Plaintiffs disagree and suggest three common questions. First, "[c]ould the Jail provide adequate dental care to detainees at the Cook County Jail with less than the seven dentists now employed at the jail?" (Dkt. 373 at 10.) This question is not common to all class members, however, since some of those members' claims arose after there were seven dentists at the jail. As discussed below, this is the basis for the court's modification of the (b)(3) class to a closed time period.

The other common questions proposed by plaintiffs raise two separate causes for detainees' prolonged dental pain, and thus actually support the finding that there is no longer a single question of causation appropriate for class treatment. The questions are (1) "Does the Jail's continuing failure to require a face-to-face evaluation from a registered nurse within 24 hours of a written complaint of dental pain result in gratuitous pain?" and (2) "Does the failure of the Jail to provide timely 'return to clinic' appointments result in preventable and gratuitous pain?" (*Id.*) Although there continue to be access to care issues at CCJ, these questions do not point to the type of "systemic and gross deficiencies in staffing, facilities, equipment, or procedures" that would lead to a finding that all detainees are effectively denied treatment of dental pain. *See Wellman*, 715 F.2d at 272.

The court finds that Rule 23(a)(2) is not satisfied for either the (b)(2) class or the (b)(3) class (as currently defined) because there is no longer a common question that can be answered in the same proceeding and for which the answer will resolve a central issue in all class

members' claims.  *See Jamie S.*, 668 F.3d at 497.  Although the court could end its inquiry here, for completeness it will also address the Rule 23(b) requirements for each class.

## II.        Rule 23(b)(2)—General Application and Appropriateness of Injunction

Rule 23(b)(2) has two related requirements.  First, defendants must base their actions on grounds applicable generally to the class and, second, final injunctive relief must be appropriate for the class as a whole.  Fed. R. Civ. P. 23(b)(2).  A (b)(2) class is appropriate when "a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant."  *Wal-Mart*, 131 S. Ct. at 2557 (emphasis in original); *see also Kartman* v. *State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 n.8 (7th Cir. 2011) ("Where a class is not cohesive such that a uniform remedy will not redress the injuries of *all* plaintiffs, class certification is typically not appropriate.") (emphasis in original).

In its order certifying the (b)(2) class, the court observed that an injunction satisfying Rule 23(b)(2) could easily be fashioned:  "An injunction ordering defendants to increase the number of dentists employed to treat the jail's inmate population would generally address plaintiffs' complaints."  (Dkt. 68 at 14 n.3.)  As discussed above, this is no longer the case because the jail has increased its dental staff to acceptable, even optimal, levels.  Because there is no longer a single identifiable remedy any injunction either would be so abstract that it would give no guidance about what is required or would delve into the minutiae of the administration of dental and health care at CCJ.  Federal Rule of Civil Procedure 65(d) forbids vague injunctions, *see* Fed. R. Civ. P. 65(d); *Shook* v. *Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008), and if the injunction is too finely fashioned, the court runs the risk of aiding some class members to the detriment of others.  For example, plaintiffs suggest that the dental

clinics should schedule appointments, but one of the dentists alluded to the fact that such a policy could mean less time spent on actual dental procedures. (*See* Tr. 1008–09.) *See also Lemon* v. *Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 580 (7th Cir. 2000) ("Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members."). It is not within the court's power or expertise to fashion an appropriate injunction in this case.[20]

The court's inability to order injunctive relief applicable to each class member is supported by the fact that plaintiffs have had difficulty articulating the outlines of their request for injunctive relief. (*Compare* dkt. 236 at 1; dkt. 370 at 1–2; Tr. 1319.) *See also Haynes* v. *Dart*, No. 08 C 4834, 2009 WL 2355393, at **9–10 (N.D. Ill. July 29, 2009) (refusing to certify a (b)(2) class for injunctive relief to remediate jail conditions where plaintiffs failed to identify the scope of equitable relief sought). The plaintiffs ask the court to order Dr. Meyer and Dr. Shulman to conduct a focus review at CCJ and make recommendations to the court. (Tr. 1319.) Plaintiffs do not cite any cases in which other courts have adopted such a remedy and do not address the myriad of issues with this request—most strikingly, who would pay the experts for their time.

Although the court grants defendants' motion to decertify the (b)(2) class, it bears mention that plaintiffs' counsel has worked tirelessly for their clients, some of whom have

---

[20] Further, the (b)(2) class definition is focused on access to a dentist rather than access to pain relief. (See dkt. 68 at 15 (defining class as detainees who wait over seven days without seeing a dentist).) This was an appropriate definition when the expected injunctive relief consisted of ordering defendants to hire more dentists. But this is not an appropriate definition when plaintiffs seek a wide range of injunctive relief that includes access to pain relief from nursing staff and access to oral surgery. (See dkt. 370 at 1–2 (requesting injunction to require face-to-face assessment by registered nurse within 24 hours of submission of an HSR form and unspecified "additional relief" to remedy issues with "scheduling follow-up appointments and access to an oral surgeon").)

meritorious claims. Indeed, the court cannot help but surmise that this suit helped bring about the changes at Cermak and CCJ which, in turn, brought about the court's decision today. If the Supreme Court had not rejected the "catalyst theory" as a basis for an award of fees, *see Buckhannon Bd. & Care Home, Inc.* v. *W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001), the court would suggest this case as a candidate for such an award.

## III.     Rule 23(b)(3)—Predominance and Superiority

Certification of a Rule 23(b)(3) class requires a court find that common questions predominate over questions affecting individual members and that the class action is superior to other methods of adjudicating the case. Fed. R. Civ. P. 23(b)(3). The inquiry is similar to commonality but is more demanding. *See, e.g., Thomas* v. *Matrix Corp. Servs, Inc.*, No. 10 C 5093, 2012 WL 3581298, at *2 (N.D. Ill. Aug. 17, 2012). To determine whether predominance and superiority are satisfied, courts examine "the substantive elements of plaintiffs' claims, the proof necessary for those elements, and the manageability of trial on those issues." *Reed* v. *Advocate Health Care*, No. 06 C 3337, 2009 WL 3146999, at *4 (N.D. Ill. Sept. 28, 2009) (citing *Simer* v. *Rios*, 661 F.2d 655, 672–73 (7th Cir. 1981)); *see also Erica P. John Fund, Inc.* v. *Halliburton Co.*, --- U.S. ----, 131 S. Ct. 2179, 2184, 180 L. Ed. 2d 24 (2011) (predominance inquiry begins with elements of underlying cause of action).

### A.     Predominance

In discussing predominance in its opinion certifying the (b)(3) class, the court observed that "[c]ourts routinely certify classes under Rule 23(b)(3) challenging uniform policies related to conditions of confinement." (Dkt. 93 at 4.) Although this holds true for cases that allege a uniform policy or practice constituting deliberate indifference, courts often refuse to certify

classes under Rule 23(b)(3) in cases alleging improper implementation of uniform policies. In those cases, courts find that individual issues predominate over common issues.

For example, the Eastern District of Michigan recently declined to certify a class of prisoners who alleged deficient medical care facilities and hygiene policies, determining that the plaintiffs' claims encompassed too many individual questions. *Rouse* v. *Caruso*, No. 06-CV-10961, 2013 WL 5775354, at *3 (E.D. Mich. Oct. 25, 2013). These included "[i]ndividualized and highly fact-specific questions of deliberate indifference, plaintiffs' specific medical needs and whether treatment was delayed or denied, [and] whether indigent-status was properly revoked . . . ." *Id.*; *see also Roadhouse* v. *Las Vegas Metro. Police Dep't*, 290 F.R.D. 535, 545–46 (D. Nev. 2013) (denying certification for arrestees subjected to group strip searches because group strip searches were not part of a policy, and contrasting cases where group strip searches were part of policy); *Schilling* v. *Kenton Cnty., Ky.*, No. 10-143, 2011 WL 293759, at **9–10 (E.D. Ky. Jan. 27, 2011) (denying certification of claims of unconstitutional deprivation of medical care at jail and observing that the commonality requirement is satisfied when class members are "affected by a *general* policy of the defendant and the general policy is the focus of the litigation") (emphasis in original); *Turner* v. *Grant Cnty. Detention Ctr.*, No. 05-148, 2008 WL 821895, at *20 (E.D. Ky. Mar. 26, 2008) (holding individual issues predominate over common issues for class of detainees alleging physical assault and subsequent lack of medical care and finding the common questions proposed by plaintiff "are so generic virtually every inmate has an interest in the question's answer").

As discussed above with respect to commonality, this case has morphed from one in which a common issue (the inadequacy of dental staffing at CCJ) predominated to one that is focused on individual issues. In addition to the issues discussed above, there are other issues

unique to each detainee's claim that demonstrate that the case is not suited for class treatment for the period after the single overriding question of causation ended. For example, detainees have different reactions to medication. A course of antibiotics may relieve dental pain in some detainees for a long period, while in others it does not relieve the pain at all. Detainees may also refuse care at one point in treatment (e.g., one detainee refused extraction at a clinic in favor of having the extraction at Stroger at a later date), which may give rise to an affirmative defense. Some detainees can no longer receive certain pain medication because the excess amounts they received in correctional facilities in the past have damaged their internal organs. For these detainees it is possible that expedited remediation of dental pain is necessary. And some detainees are held in more restrictive areas, which may result in longer delays in receiving treatment. All of these issues go to liability and require individual assessment.

In other words, once the dental clinics became staffed to the point they met the standard of care, the court's original finding of predominance, as with commonality, is no longer correct.

## B. Superiority

A party seeking certification of a (b)(3) class must also show that the class action vehicle is superior. This is closely tied to predominance because a class action is only a superior vehicle if it reduces litigation costs and promotes efficiency. Rule 23(b)(3) lists the following factors for a court to consider in determining whether a class action is superior:

> (A)    the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D)    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

For the reasons discussed above, for the time period after defendants adequately staffed the dental clinics at CCJ, a class action is not a superior vehicle and the question of whether remediation of dental pain for a detainee fell below the deliberate indifference standard is better suited for individual actions. For the time period prior to adequate staffing, however, a class action remains superior.

Defendants disagree, arguing that "the ongoing discovery disputes, moving target of allegations and massive amount of opt-outs has created management problems which far outweigh the potential efficiencies of proceeding as a class action." (Dkt. 380 at 14; *see also* dkt. 309, ex. H (listing over 300 opt outs).) But much of the work has already been completed, and the court is prepared to expedite the resolution of the remaining issues.

Thus, rather than decertifying the (b)(3) class, the court will modify the definition to include an end date for inclusion in the class. *See Hawkins* v. *Securitas Sec. Servs. USA, Inc.*, 280 F.R.D. 388, 392 (N.D. Ill. 2011) (modifying class definition) (citing *In re Motorola Sec. Litig.*, 644 F.3d 511, 519 (7th Cir. 2011)). Once an end date for the class period is determined, the question of liability is common to the class and individual hearings regarding damages for the class members can be held. Preferably, of course, the parties will agree to resolve those claims through negotiations.

**CONCLUSION**

Defendants' motion to decertify (dkt. 306) is granted in part and denied in part. The court decertifies the (b)(2) class and will modify the (b)(3) class definition in a manner to be determined. Plaintiffs' motion for a permanent injunction (dkt. 236) is denied as moot, as is defendants' motion to strike portions of plaintiffs' proposed findings of fact (dkt. 343). The parties are directed to confer in an effort to reach agreement on a closing date for the class period

and to discuss parameters for possible settlement of the entire case.  A status hearing is set for

January 20, 2015 at 10:30 a.m.


Date: December 22, 2014                         _Joan H. Lefkow_____